IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

BRANDON B. LOVETT,

    Plaintiff,

v.

GEORGIA-PACIFIC CONSUMER
PRODUCTS, LP,

    Defendant.

CIVIL ACTION NO. 4:17-cv-64

**O R D E R**

Presently before the Court is Defendant Georgia-Pacific Consumer Products' (at times, "Georgia-Pacific") Motion for Summary Judgment. (Doc. 31.) This action concerns Defendant's decision to terminate Plaintiff Brandon B. Lovett's employment for "sleeping at his desk" in violation of company policy. (See Doc. 1; doc. 33, p. 2.) Plaintiff filed his Complaint on March 31, 2017, alleging that he was discharged because of his race in violation of Title VII and 42 U.S.C. § 1981. (Doc. 1, pp. 6–7.) In support of this contention, Plaintiff identifies two white employees who he claims received "no disciplinary action" after they were investigated for similar behavior. (Id. at p. 5.) Defendant subsequently filed the at-issue Motion for Summary Judgment, Plaintiff filed a Response in Opposition, (doc. 33), Defendant filed a Reply, (doc. 35), and Plaintiff filed a Surreply, (doc. 38). As explained below, however, the Court finds that the evidence presented by Plaintiff in this case is not enough for a reasonable jury to find that Defendant intentionally discriminated against him on the basis of race within the meaning of Title VII and Section 1981. Thus, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 31.) The Court

**DIRECTS** the Clerk of Court to enter summary judgment in favor of Defendant and to **CLOSE** this case.

**BACKGROUND**

The material facts in this case are not in dispute. Plaintiff Lovett is an African-American male who worked for Defendant Georgia-Pacific at the Savannah River Mill facility in Rincon, Georgia, from 2013 until his termination in March of 2016. (Doc. 31-1, pp. 1, 4; doc. 33, p. 9.) At all times relevant to this action, Plaintiff worked as an "allocator." (Doc. 33, p. 1.) Allocators worked within the logistics department and sat in a specific office called the "allocation room." (Id. at pp. 1–2.) Pursuant to Defendant's policy, employees in the logistics department were permitted to take three breaks per shift—two 15-minute breaks and one 30-minute break for lunch. (Id. at p. 5; doc. 33-1, p. 17.) When Plaintiff first started as an allocator, logistics employees generally took their breaks in the allocation room. (Doc. 31-2, pp. 20–23.) At times, employees napped during their breaks, but napping was not tolerated outside of designated break times. (Id. at pp. 59–60.) According to Dennis Bazemore, the performance and capability leader for the logistics department, Defendant had a "zero tolerance" policy for "sleeping on the job."[1] (Id. at pp. 5–6, 12.) When an employee is accused of sleeping on the job, the matter is referred to Bazemore, who investigates the allegation prior to taking any disciplinary action. (Doc. 31-3, pp. 5–11.) Generally, employees are suspended "pending the outcome of [the] investigation." (Id. at p. 12.)

Bazemore testified that he considers the "whole picture" surrounding an incident to determine what consequence is appropriate. (Id. at p. 6.) In the context of sleeping at work, Bazemore explained that he looks to whether the employee was on a break and what evidence is

---

[1] Bazemore defined "sleeping on the job" as sleeping in one's "work area" outside of break time. (Doc. 31-3, p. 13.)

available.  (Id. at pp. 6, 11, 15.)  Bazemore also stated that during his time at Georgia-Pacific, the "majority" of employees found to be sleeping on the job were terminated.  (Doc. 31-3, pp. 7, 12.)  For example, Defendant terminated Donald Cooper, a forklift driver, after two employees saw him asleep at the wheel.  (Doc. 31-3, pp. 8–10.)  Bazemore explained that the two employees' observations were "the main factor[s]" in his decision to terminate Cooper.  (Id. at p. 11.)

However, Bazemore also noted that investigations do not always reveal proof that an employee was sleeping on the job.  In early 2016, Bazemore looked into the conduct of several individuals after receiving general reports that logistics employees were "sleeping at work."  (Id. at pp. 15–17.)  Among those investigated were two white males—Justin Farmer and Daniel Burke—and one black male—Ricardo Edwards.[2]  (Doc. 31, p. 4; doc. 31-2, p. 52.)  In the course of his investigation, Bazemore spoke to other employees about Farmer, Burke, and Edwards' behavior, including Plaintiff.  (Doc. 31-2, p. 50; doc. 31-3, p. 18.)  Plaintiff told Bazemore that he saw people sleeping in the allocation room, but that he did not have any knowledge as to whether they were sleeping while on duty.  (Doc. 31-2, pp. 52–53; doc. 31-3, p. 15.)  Bazemore explained that the investigation did not reveal any other evidence "to confirm [that Burke, Farmer, or Edwards] were sleeping beyond a breaktime."  (Doc. 31-3, pp. 19–21.)  Due to the lack of such evidence, the employees were not terminated.[3]  (Id.)  However, Edwards was demoted from his leadership role due to the nature of the position.  (Id. at p. 19.)

As a result of the investigation, Defendant changed its policies regarding break locations a few weeks prior to Plaintiff's termination.  (Id. at p. 21; doc. 31-2, pp. 25, 51–52.)  Defendant

---

[2] Farmer operated a forklift, Burke was an allocator, and Edwards worked in a supervisory role as a performance coach.  (Doc. 33-2, pp. 5–6; doc. 33-3, p. 6; doc. 33-4, p. 23.)

[3] It is undisputed that Burke admitted to sleeping while on a break and Farmer was terminated after the investigation due to "large gaps of downtime" and decreased productivity.  (Doc. 31-3, p. 20–21.)

informed logistics employees that they were no longer allowed to take breaks in the allocation room.[4] (Doc. 31-2, pp. 21, 51–52.) Instead, they were to use official break rooms located throughout the building. (See id.; doc. 33-2, p. 18.) While the new policy restricted the employees' choice of locations, it seemingly did not restrict their ability to take naps while on break. Plaintiff testified that his supervisor, Tommy Evans, encouraged allocators to "go to the break room . . . and take about a 10, 15-minute nap" if they felt tired. (Doc. 31-2, p. 59.) Plaintiff further explained that he slept on his breaks about once per week and would usually "set [his] phone to wake [him] up."[5] (Id. at p. 68.)

On the night of March 11, 2016, Plaintiff was working a twelve-hour shift. (Doc. 31, p. 2; doc. 31-1, p. 1.) Around 4:40 a.m., Evans walked by the allocation room where Plaintiff was working. (Doc. 33-1, pp. 26–27; doc. 31-4, p. 42.) Evans and Willie Ferguson, another employee, saw that Plaintiff was asleep at his desk. (Doc. 33, p. 2; doc. 31-1, p. 3.) When Plaintiff woke up, Evans told Plaintiff to gather his things because Defendant's policy required an employee found sleeping on the job to leave the premises immediately. (Doc. 31, pp. 2–3.) Plaintiff initially resisted Evans' instructions and asked to see the policy that mandated his departure, at which point Evans called Bazemore to report both the incident and Plaintiff's noncompliance.[6] (See Doc. 31-2, pp. 71–72; doc. 31-3, pp. 23–24.) Bazemore informed Evans that Plaintiff needed to go home and encouraged him to seek assistance from Larry Barnes, another supervisor, if Plaintiff refused to do so. (Doc. 31-3, pp. 23–25; doc. 31-4, p. 43.) Evans then contacted Barnes, and Barnes

---

[4] While there is no evidence indicating that the policy was ever put in writing, it is undisputed that Plaintiff and the other employees were aware of the policy change. (Doc. 31-2, pp. 21, 51–52; doc. 33-3, pp. 17–19; doc. 33-2, p. 18.)

[5] Plaintiff did not specify where he took these naps.

[6] Plaintiff received a copy of the policy at a later date. (Doc. 31-2, pp. 70.)

walked to the allocation room to reiterate that Plaintiff needed to leave. (See id.; doc. 31-1, p. 3.) Plaintiff complied, and the two supervisors escorted him out of the building. (Doc. 31-2, p. 73.)

Plaintiff was subsequently placed on administrative leave pending an investigation into Evans' allegations. (Doc. 31-3, pp. 22–24.) Specifically, the investigation was focused on whether Plaintiff "was sleeping in the Allocator office on Friday, March 11th, 2016." (Doc. 31-4, p. 41.) The "investigation team," comprised of Bazemore and Ashley Splittgerber, a Human Resources Generalist, spoke with Evans, Barnes, Ferguson, and Plaintiff. (Doc. 31, p. 3.) The discussions were memorialized by the investigation team and ultimately became a part of the "Investigation Plan & Summary," the official investigation file. (Doc. 31-4, pp. 32, 41–51.) In their interviews, Evans, Barnes, and Ferguson recounted the events described above, and there is no evidence that they participated in or influenced the investigation beyond the conversations contained in the investigative file. (See id.; doc. 31-1, p. 5.) In Plaintiff's interview with the investigative team, he stressed that he "[h]appened to doze off" and "wasn't asleep for more than five minutes." (Doc. 31-4, p. 46.) At the end of the investigation, the team concluded that the "claim of [Plaintiff] sleeping in the Allocator office was substantiated," and ultimately decided to terminate Plaintiff's employment. (Id. at p. 41; doc. 31-1, p. 4.)

On March 25, 2016, Defendant notified Plaintiff of his termination and advised him of his right to appeal the decision. (Doc. 31-1, p. 5.) Plaintiff chose to exercise this right and wrote a letter in support of his appeal. (Id.; doc. 31-2, pp. 93–94.) In his letter, Plaintiff emphasized that this was his "first offense," noting that his work record was devoid of prior infractions. (Doc. 31-2, pp. 93–94.) The letter does not refer to race or discrimination, but Plaintiff did state that he felt the "case was not handled properly" and that the decision to terminate him was "not right" in light

5

of his "pointing out the false accusations that were clearly the basis for [his] termination."[7] (Id. at pp. 77, 93–94.) After he submitted his appeal, Plaintiff met with Rob Shaw, the Vice President of Manufacturing Operations at Defendant's Savannah River Mill facility. (Id. at p. 78.) The pair spoke for a few minutes, and Shaw listened to Plaintiff's concerns. (Doc. 31-1, p. 6.) Following the meeting, Plaintiff received a letter from Shaw. (Id.) Shaw explained that, after looking into the investigation, talking to "many of the people involved," and reviewing "all of the circumstances around [Plaintiff's] incident," he decided to uphold Plaintiff's termination. (Id.)

Plaintiff then filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 31-2, pp. 87, 96.) The charge states that while Plaintiff was terminated for sleeping on the job, two Caucasian employees, Burke and Farmer, were "found sleeping on the job but were not discharged." (Id.) Plaintiff received his Notice of Right to Sue from the EEOC on January 17, 2017 and filed the present Title VII and 42 U.S.C. § 1981 action on March 31, 2017. (Doc. 1, pp. 1, 12.) Plaintiff's Complaint reiterates the basis for his EEOC charge but also alleges that Evans "regularly made comments displaying his belief that African[-]American people were lazy or did not want to work." (Id. at 19.) According to Plaintiff, this allegation stems from two separate instances where employees informed him that other employees heard Evans make racial remarks.[8] (Doc. 31-2, pp. 38–44.) It is undisputed, however, that neither Plaintiff nor the employees who told Plaintiff about the comments heard these statements themselves. (Id.)

---

[7] In his deposition, Plaintiff conceded he has no evidence that any person involved in the decision to terminate his employment was racist or took any action based on his race. (Doc. 31-2, pp. 80–81.)

[8] Plaintiff heard about Evans' first comment in 2014 and explained that the comment was "something racial." (Doc. 31-2, pp. 39, 43.) However, he does not recall any other details. (Id.) Plaintiff remembers hearing about the second comment in early 2016, when two employees told him Evans said "[i]t was time to go fire another one of those persons," by which he meant "black and lazy." (Id. at pp. 41–42.)

6

**STANDARD OF REVIEW**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party

only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted).

## DISCUSSION

### I. Title VII and 42 U.S.C. § 1981 Race Discrimination: Disparate Treatment

Plaintiff claims that Defendant is liable pursuant to Title VII and 42 U.S.C. § 1981 under a theory of discriminatory discharge. (Doc. 1.) Defendant moves for summary judgment as to both claims. (Doc. 31.) As an initial matter, the Eleventh Circuit Court of Appeals treats Title VII and Section 1981 discriminatory-discharge claims as parallel causes of action with the same standards of liability and proof. Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Accordingly, the Court will discuss Plaintiff's Title VII and Section 1981 claims with a unified analysis, "explicitly address[ing] the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).

Claims of intentional discrimination arise out of Title VII's "disparate treatment" provision, which provides, in relevant part, that it is "unlawful" for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To prevail on such a claim, a plaintiff must prove "the employer intended to discriminate" against him. Armstrong v. Flowers Hosp., 33 F.3d 1308, 1313 (11th Cir. 1994). This can be done through either direct or circumstantial evidence. See E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes

8

the existence of discriminatory intent behind the employment decision without any inference or presumption." Id. (citations omitted). Said differently, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 n.2 (11th Cir. 1998). Here, it is undisputed that Plaintiff does not have direct evidence of intentional discrimination. (Doc. 33, pp. 8–9.)[9] Absent direct evidence, Plaintiff must show Defendant's discriminatory intent through "the familiar McDonnell Douglas [burden-shifting] paradigm for circumstantial evidence claims." Joe's Stone Crab, 220 F.3d at 1286; see McDonnell Douglas Corp. v. Green. 411 U.S. 792, 800 (1973).

Under McDonnell Douglas, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. Id. at 802. Once the plaintiff makes this showing, a presumption of discrimination is created and the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citation omitted). Finally, should the defendant satisfy this burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." Lewis v. City of Union City, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc) (citation and internal quotation marks omitted).

In its Motion, Defendant argues Plaintiff's disparate treatment claim fails for two reasons. First, Defendant contends that Plaintiff fails to establish a prima facie case of discrimination

---

[9] In its Motion, Defendant argues that Plaintiff has no direct evidence of discrimination. (Doc. 31, p. 8.) Plaintiff does not dispute this contention in his Response. (Doc. 33.) Instead, Plaintiff avers "[t]here is circumstantial evidence of [r]ace [d]iscrimination" and focuses on establishing a prima facie case under the McDonnell Douglas framework. (Id. at p. 8–9.) Thus, the Court will not address the issue of whether there is direct evidence any further.

9

because he has not shown that he was treated less favorably than any similarly-situated employees outside of his protected class. (Doc. 31, pp. 10-12). Even if Plaintiff could meet this initial burden, however, Defendant avers Plaintiff cannot show that Defendant's proffered nondiscriminatory reason for his termination—sleeping in the allocation room—was pretext for illegal discrimination. (Id. at pp. 12-13.) The Court will address each argument in turn.

### A. Plaintiff's Prima Facie Case

Upon careful review of the record and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff is unable to make a prima facie case of race discrimination. To establish his prima facie case, a plaintiff must show: "(1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question," and (4) that "similarly situated" employees outside his protected class, known as comparators, received favorable treatment. Lewis, 918 F.3d at 1220. Here, Plaintiff satisfies the first three elements; it is undisputed that Plaintiff is African-American and that he was terminated from a job he was qualified for. (See, e.g., Doc. 31, p. 2.) However, Defendant argues that Plaintiff cannot establish his prima facie case because his proffered comparators, Burke and Farmer, are not similarly situated as a matter of law. (Doc. 31, pp. 4, 10–12.) Specifically, Defendant contends that the differences between the conduct of Plaintiff and his alleged comparators explain the discrepancy in disciplinary action, therefore precluding Plaintiff from using Burke and Farmer to satisfy this element of his prima facie case. (Id.)

In the recent en banc decision of Lewis v. City of Union City, the Eleventh Circuit Court of Appeals clarified the proper standard for evaluating the sufficiency of a plaintiff's proffered comparator. 918 F.3d at 1218–1229. In doing so, the Court rejected prior language requiring a

plaintiff to show that his circumstances and those of another employee were "nearly identical."[10]

Id. Instead, "a plaintiff proceeding under McDonnell Douglas must show that she and her comparators were 'similarly situated in all material respects.'" Id. at 1226. The court explained that the "materially similar" model gives plaintiffs the opportunity to establish "an inference of unlawful discrimination" while affording employers the "necessary breathing space to make appropriate business judgments." Id. at 1228. Finally, the "all-material-respects standard" promotes judicial economy "by allowing for summary judgment in . . . cases . . . where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." Id. at 1229. Under this standard,

> a similarly situated comparator will have engaged in the same basic conduct (or misconduct) as the plaintiff; will have been subjected to the same employment policy, guideline, or rule as the plaintiff; will ordinarily have been under the jurisdiction of the same supervisor as the plaintiff; and will share the plaintiff's employment or disciplinary history. In short, as its label indicates—"all material respects"—a valid comparison will not turn on formal labels, but rather on substantive likeness[;] . . . a plaintiff and her comparators must be [so] sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.

Id. at 1227 (internal citations and quotation marks omitted).

Additionally, the Eleventh Circuit has noted that some factors have greater importance than others in cases alleging discriminatory discipline. Lower courts are advised to "consider whether the [comparators] are involved in or accused of the same or similar conduct and are disciplined in

---

[10] The parties' briefs utilize the "nearly identical" standard as they were filed prior to the Eleventh Circuit's decision in Lewis. However, a new rule of law is generally retroactively applied to pending cases where there is no inequity in doing so. See Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 544 (11th Cir. 2002) (en banc). Moreover, the Eleventh Circuit applied its ruling in Lewis to the parties before it, 918 F.3d at 1229–31, and in several cases thereafter that were already pending on appeal. See Cornell v. Brennan, 775 F. App'x 630, 633 (11th Cir. 2019) (per curiam); McQueen v. Alabama Dep't of Transp., 769 F. App'x 816, 822 (11th Cir. 2019) (per curiam). As the new "all-material-respects" standard presents a lower threshold (and is thus easier for a plaintiff to satisfy) than the prior "nearly identical" standard, the parties' arguments in their briefs on this issue are applicable despite the change; accordingly, the Court applies Lewis to this case.

11

different ways." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); see Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted) (advising courts to compare a plaintiff's actions to "the quantity and quality of [a] comparator's misconduct" so as to avoid "confusing apples with oranges"). This consideration includes identifying differences "that would distinguish [the comparator's] conduct or the employer's treatment of them for it." Sanguinetti v. United Parcel Serv., Inc., 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000), aff'd, 254 F.3d 75 (11th Cir. 2001).

Turning to the facts of this case, the Court finds that Burke and Farmer are not similarly situated in "all material respects" because there is no evidence that Defendant treated them more favorably for the same the same type of "misconduct" that resulted in Plaintiff's termination. See Lewis, 918 F.3d at 1226–27. It is undisputed that Defendant permitted employees to nap during their allotted break periods; sleeping outside of those breaks, however, was forbidden. (Doc. 31-2, pp. 20–23; doc. 31-3, pp. 6, 12.) Plaintiff was discharged for "sleeping on the job" after Defendant's investigation concluded that he fell asleep at his work station in the allocation room. (Doc. 33, p. 2; doc. 31, p. 2.) Plaintiff admits that he had not planned to take a break prior to falling asleep and two witnesses, Evans and Ferguson, saw Plaintiff sleeping at his desk. (Doc. 31-2, pp. 48, 66, 68.) As for his alleged comparators, it is undisputed that Defendant's investigations into Burke and Farmer did not reveal any evidence that either employee slept outside of their break times. (Doc. 33, pp. 6–7; doc. 31-2, pp. 47–48, 52, 62.) There was no evidence that, like Plaintiff, Burke or Farmer ever fell asleep at their workstations—intentionally or otherwise—or took any "unintentional" breaks by "dozing off."[11]

---

[11] In his Response, Plaintiff disputes that Burke and Farmer "were not sleeping beyond their break time." (Doc. 33, pp. 6–7.) However, this is not what Defendant alleges. Defendant states that there was no proof indicating Burke or Farmer slept while they were on duty—a position that does not opine on whether either

Additionally, Defendant's break policies in effect during Plaintiff's sleeping incident and the policies in place during the earlier incidents of his alleged comparators were substantially different. At the time Burke and Farmer were investigated, the allocation room was considered an acceptable place for logistics employees to take their breaks. (Doc. 31-2, pp. 20–23.) Following the investigation, however, Defendant forbade employees from sleeping in the allocation room.[12] (Id. at pp. 25, 51–52; doc. 31-3, p. 21.) This meant that any employees who wanted to sleep during their break times could not do so in the allocation room. (Doc. 31-2, p. 59; doc. 31-3, p. 31.) The change occurred before Plaintiff's incident and at least a few weeks before his termination. (Doc. 31-2, pp. 25, 51–52.) Thus, Defendant considered Plaintiff's case against a rule that forbade *any* sleeping in the allocation room, regardless of whether an employee was on a break. This policy did not exist when Burke and Farmer were investigated, and Plaintiff has not offered any evidence that Defendant declined to discipline them for sleeping in the allocation room after the rule was established.

---

employee actually did so. Further, Plaintiff conceded in his deposition that he has no reason to think Defendant knew or had any evidence to show that either Burke or Farmer slept outside of a break. (Doc. 31-2, pp. 53–54.) Thus, Plaintiff has not put forth affirmative evidence to create a factual dispute about Defendant's investigative conclusions. See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1317 n.5 (11th Cir. 2003) (claim that proffered comparator engaged in similar misconduct irrelevant without evidence that employer had knowledge); Summers v. City of Dothan, 444 F. App'x 346, 348 (11th Cir. 2011) ("Knowledge of a prior act cannot be imputed on a decision maker, because '[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.'") (quoting Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001)).

[12] Although the policy was not distributed in written form, Plaintiff concedes he had knowledge of the new rule and has not provided evidence that this rule was applied in a discriminatory fashion. See Beaver v. Rayonier, Inc., 200 F.3d 723, 729 n.2 (11th Cir. 1999) (declining to consider whether guidelines were written down because what matters is whether the employer considered an impermissible factor in making its decision).

These differences preclude Burke and Farmer from being considered "similarly situated" to Plaintiff in "all material respects."[13] See Lewis, 918 F.3d at 1227–28. As there is no evidence that Plaintiff and his alleged comparators engaged in the same or similar conduct and because a different "employment policy, guideline, or rule" was in effect at the time of their respective actions, no meaningful comparison can be made between the differences in disciplinary actions. See Id. at 1222–23, 1227 ("[T]reating different cases differently is not discriminatory."). Accordingly, because Plaintiff has failed to identify proper comparators, he cannot fulfill his burden to establish a prima facie case for race discrimination and Defendant is entitled to summary judgment on all claims asserted against it. See Connelly v. Metro. Atlanta RTA, 764 F.3d 1358, 1363 (11th Cir. 2014) (affirming grant of summary judgment where plaintiff failed to make out prima facie case).

### B. Plaintiff has not Shown that his Termination was Racially Motivated

Even if Plaintiff could establish a prima facie case of discrimination, Defendant is nonetheless entitled to summary judgment because Plaintiff cannot show Defendant's legitimate, nondiscriminatory reasons for Plaintiff's termination were merely pretext for race discrimination. See Lewis, 918 F.3d at 1221. "An employer's burden to articulate a non-discriminatory reason for [an adverse employment action] is a burden of production, not of persuasion." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). This burden "involves no credibility determination" and only requires the employer to state "a clear and reasonably specific non-discriminatory basis" for its actions. Id. at 769–70. Here, Defendant's stated reason for Plaintiff's

---

[13] In his Response, Plaintiff frequently discusses Defendant's treatment of Ricardo Edwards, an African-American employee who was investigated along with Burke and Farmer. (Doc. 33.) However, it is well-established that Plaintiff must provide comparators *outside* his protected class. See, e.g., Burke-Fowler, 447 F.3d at 1323 (describing elements of prima facie case).

14

termination—sleeping on the job at his work station—satisfies this "exceedingly light" burden. See id.; Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988) (describing employer's burden at this stage as "exceedingly light"); see also Chapman v. AI Transp., 229 F.3d 1012, 1031 (11th Cir. 2000) (burden met where stated reason may motivate a reasonable employer).

At this point, the burden shifts back to Plaintiff to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. at 1024. "[T]his obligation [is one] that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." Lewis, 918 F.3d at 1221 (citation and internal quotation marks omitted). "To show pretext, [an employee] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted). However, an employee is "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." Chapman, 229 F.3d at 1030. Rather, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

Here, Plaintiff has not met this burden. In his Response, Plaintiff first argues that Evans' racially-charged comments demonstrate that Defendant's decision was motivated by discrimination. (Doc. 33, pp. 3, 6.) However, there is no evidence that Evans had any impact on the decision to terminate Plaintiff or that Evans influenced the decisionmakers—Bazemore, Splittgerber, and Shaw. (Doc. 31-1, p. 5; doc. 33, p. 6.) "[A] non-decisionmaker employee's discriminatory remarks are 'not probative of a discriminatory intent behind [an employee's]

15

termination[,]'" and therefore cannot be used to establish pretext. Payne v. Goodyear Tire & Rubber Co., 760 F. App'x 803, 808 (11th Cir. 2019) (quoting Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998)); see Holifield, 115 F.3d at 1563–64 (citation omitted) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.")

Plaintiff also argues that Defendant's reason is "pretextual because [the] application of the policy actually served to work against the Defendant's own best interest." (Doc. 33, p. 10.) Plaintiff contends that the policy "resulted in the termination of [Plaintiff] who had a good work record and whose performance was not negatively impacted by his sleep." (Id.) While Plaintiff may have been an exemplary employee, the Court is not a "super-personnel department," and may not "second-guess the wisdom of an employer's business decisions." Alvarez, 610 F.3d at 1266. As the Eleventh Circuit has "repeatedly and emphatically held, . . . employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Flowers v. Troup Cty., 803 F.3d 1327, 1338 (11th Cir. 2015) (internal citations and quotation marks omitted). The record before the Court shows that Defendant terminated Plaintiff after he unintentionally fell asleep at his work station in the allocation room. Plaintiff fails to supply, and the Court is not aware of, any evidence showing that Defendant's decision to terminate him on this basis was pretext for race discrimination. The burden of persuasion rests with Plaintiff and, "without more[,] there is nothing to suggest a causal connection between his race and his termination." Id.

Accordingly, even assuming Plaintiff could establish his prima facie case, he still fails to meet his burden to show that Defendant's proffered non-discriminatory reason was pretext for discrimination. Without similarly situated comparators or any other evidence to support an

inference of intentional discrimination, and Plaintiff's claims fail as a matter of law. As such, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's Title VII and 42 U.S.C. § 1981 race discrimination claims. (Doc. 31.)

## II. Attorney's Fees

Plaintiff also requests attorney's fees and expenses of litigation for his discrimination claims. (Doc. 1, p. 7.) Title VII provides that the district court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1225 (11th Cir. 2010) (quotation marks omitted); see 42 U.S.C. § 2000e–5(k). The same principle applies when a Plaintiff seeks to recover attorney's fees under other federal laws. See 42 U.S.C. § 1988 (providing that the court may allow "the prevailing party, other than the United States, a reasonable attorney's fee"). Because none of his claims survive summary judgment, Plaintiff is not a prevailing party and his claim for attorney's fees also fails. Accordingly, the Court **GRANTS** summary judgment in favor of Defendant on this issue.

## III. Punitive Damages

Plaintiff also argues that he is entitled to punitive damages. (Doc. 1, p. 7.) Under Title VII and Section 1981, punitive damages are limited "to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). For the reasons discussed above, Plaintiff's claims alleging race discrimination under a theory of disparate treatment fail as a matter of law. Thus, Plaintiff cannot show that Defendant engaged in intentional discrimination and therefore cannot show he is entitled to punitive damages. Accordingly, the Court **GRANTS** Defendant's Motion on this issue.

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** Defendant Georgia-Pacific Consumer Products, LP's Motion for Summary Judgment. (Doc. 31.) The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Defendant and to **CLOSE** this case.

**SO ORDERED**, this 3rd day of October, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA